presentation, please step up to the podium. State your name and the party you represent. Good morning, Your Honors. Assistant State's Attorney NeAngela Marshall on behalf of the people of the State of Illinois. Good morning. Laura Weiler from the Appellate Defender's Office on behalf of Jason Russel. Good morning. This case, we have allotted 30 minutes to argue. That time will be divided equally between the two parties. The appellant can reserve some time for rebuttal, if you'd like. And with that, you may proceed. Thank you. May it please the Court, this morning I would like to focus on the first issue of my brief, and I would like to reserve about five minutes for rebuttal, if I may. The trial court in this case erred when it denied Mr. Russel's motion to quash arrests and suppress evidence. Here, the evidence clearly demonstrates that he was arrested in his home, without a warrant, and without any probable cause. Why no probable cause? I'm sorry? Address probable cause. Certainly. Well, at the time of the arrest, the police had no information that Jason Russel was actually associated with this offense in any way. I'm sorry? He's coming out early at you. Yeah, I'm coming out early. I'm happy to discuss probable cause here. I've got a squirrel on my arm, too. Anyway, squirrel is who we're looking for. We don't care about Jason right now. So a squirrel, tell me why they don't have probable cause with squirrel. Well, because there is no eyewitness to the offense identifying squirrel as being involved with this whatsoever. At most, the police, as Detective Arteaga said at trial, he was a potential witness. Remember that squirrel and Mr. Falcher were friends. There was no bad blood between them. Why don't you give us your distillation of what it is that Dorsey told Detective Arteaga that happened to that doorstep? She told the detective that she dropped Mr. Falcher off at a specific address. Who was in front of that specific address when she got there? Squirrel was in front of that address. Okay, so we have the address and we have a person with this moniker that we're going to probably make a couple more unfortunate puns with. Okay. Then, any other information from Dorsey to Arteaga? The... Timing, right? Right, yes. She dropped him off at about 10 o'clock and the offense happened between 10.20 and 10.30. So we do know that squirrel, this person named squirrel... What about the car? Okay, she said the car that squirrel had was a 1994 Buick Regal. The witnesses who were at the scene of the offense described the car not as a two-door but as a four-door boxy Chrysler. So we know, first of all, that Ms. Dorsey dropped Mr. Falcher off at this address. That a person named squirrel was standing in front of there. That squirrel and him were friends. Ms. Dorsey then drove off before she saw if they got into the car, if they didn't get into the car. I believe she said she didn't see this other person, Z-Man, anywhere near. So we do know that something happened and I will agree that it was a short time period. But that doesn't equal probable cause that this person... Doesn't it start it? I'm sorry? Isn't it step one in probable cause? Well, it's reasonable suspicion, but that's not enough to arrest a person in your home without an arrest warrant. Well, we'll come to arrest because I don't see an arrest there. Okay. I'm happy to discuss arrest whenever you want because I think the facts here clearly demonstrate that there was arrest. Let's talk just a little bit more about the vehicle. Sure. Was there also some police work done with respect to the vehicle that was seen in front of the address where squirrel resided? The police did see a 1994 Buick Regal in front of the address and they did impound, they had ordered that... Which she had identified. She identified that as squirrel's vehicle, but we have two eyewitnesses at the scene of the offense. You've told us that. Right. We're going to try to go a little bit step by step if we can. Sure. So they impounded it, but other than just grabbing it, did they get VIN number, did they ever get any other identifying information that might have tied the vehicle to Russell and or squirrel? I don't believe, I believe that the record indicated that they knew that that car was squirrel's. I'm not entirely sure. I don't think the record indicated that they ran it. You said a VIN number in one of your briefs. Okay. I'm sorry. That's what I'm a little bit, that's what I'm sort of trying to flesh out here today and we'll talk to your colleague from the state as well, because if there were information that tied the vehicle to the defendant after they were brought to the defendant's doorstep by the information from Dorsey, wouldn't that then amount to probable cause given the time frame here? No. Why not? Because, again, we only have that he was at most a potential witness. You have to have a reasonable person led to believe that a person committed an offense in order to have probable cause to arrest somebody. The police may have known if we agree that squirrel and Jason were the same person, which I'm not willing to get there yet, but if you agree with that, that still does not equal probable cause. We have somebody who might have witnessed a murder, but we don't have a weapon, we don't have a person placing him there, we don't have any physical evidence tying him. And we then have, and you'll say it's hearsay, we have the statement by Holloway or whatever his name was, as to Dave, which ties him to Z-Man. Well, the court dismissed that pretty much out of hand. Yes, but even though it's hearsay, it's admissible for a probable cause hearing. When the trial court dismissed it, what do you mean by that? Well, the court said that's not a hefty factor, I have no idea how much weight would be given to that. It's really more than hearsay, it's like double or triple hearsay. But it's still for a probable cause to create the steps. It's admissible. But even the statement only indicates that he was present. I know, but now we're framing and honing in, which gives the police their bases to go forward. Now, whether there was an arrest or not, I'm saying there was no arrest, and that they're still investigating, and that the investigation continues when he has him say that at some point he talks about Z-Man to them. Mr. Russell? Holloway, I think he's talking about. Are you talking about Holloway? Are you talking about the hearsay statement or Russell's statement later at the police station? Russell's statement about Z-Man. When does that occur? That occurs 36 hours after his arrest. So you're saying nothing happened between when they took him and they Mirandized him. Well, I'm sorry, Your Honor. We do know that something must have happened because the officers did say we spoke to Russell and then we went and looked for Ronald Noble. Yeah, so they're still investigating. They're still investigating. They're looking for somebody else. They're looking for the murderer. Right, so at this point he is still okay, meaning he's not their primary suspect at this point. Because there was no probable cause to arrest him, exactly. Well, I'm saying an arrest hasn't occurred yet. Well, if I could, I'd like to address that really quickly because I think the facts here, the totality of the circumstances, really only lead to the conclusion that he was arrested because you have to remember the whole totality of the circumstances, including the subjective intent of the police officers. So you have six armed police officers with their weapons shown, not drawn, but shown. Have you been to any of the local things lately, what they do on the west side now? You may have 20 officers, and that's still not an arrest. It wasn't very inviting. Hypothetically, I'm giving you that things have changed a little. It's not necessarily safe for officers to go to a building, so numbers is a meaningless term. In today's market. We do have to remember, though, that under Vennon Hall, it's whether a reasonable person would have felt free to leave. So we have to, I understand the officers have to take precautions, but we're taking a look at this from a reasonable person's, not the officer's, standpoint. Although the intention of the officers is one factor. But remember, the officers didn't do this in the middle of the day. They went to his house at 1130 at night. I'm sorry, I'm just thinking of my daughter. Her reasonable hours of the day are about from 7 p.m. to 3 a.m. Well, it was not regular business hours. They not only took him, they took his car, too, right? They took him. They took his car. He wasn't even dressed at the time. That indicates this person was not going about his business during the day. They said this couldn't wait until the morning. It has to happen now. Which would lead someone to say, I can't say, I will call your officer. Well, they didn't say, you have to go. They didn't say, in words, you have to come. But the actions here lead up to that. Because remember, also, they took him in a police car. Couldn't they have policed him without a warrant? No. No. So he could have said no. He didn't know that he could say no. A reasonable person. We don't know that. Well, the facts here lead up to that. You have six armed police officers in your house at 630 at night that say, I want to put you in the back of a police car. And then when I get to the station, I'm going to fingerprint you and take your mug shots and put you in a 13 by 13 room and leave you there for 36 hours. This was an arrest. The arrest report even said he was arrested at his house and taken to the police station. There was an arrest here. The trial court was not even confident in his finding. Twice referring to the fact that this court very well might reverse his finding. But he was brought to a convenient place, right? An interrogation room where he remained for how long? For 36 hours. He was put in a lineup. These are all indicative of an arrest. And remember, he's never been convicted of anything before. If he wanted to go, what you're saying is that he wouldn't feel free to leave? He would not have felt free to leave. But if he wanted to go, like, to the bathroom, for example, what would he have to do? He had to knock on the door and say, hey, can I please leave to go to the bathroom? Again, standard operating policy. But how is Jason Russell supposed to know that, Your Honor? Because he's been there 10 times before. He's never been convicted. There's no indication he was arrested on a first degree murder charge. He has relatively low experience with the criminal justice system. There's no real development of what his arrest record is. Certainly has no prior convictions as a juvenile or as an adult. This is somebody, he wasn't allowed to walk about the police station. He wasn't allowed to say, I'll come by tomorrow. I'm going to get a good eight hours of sleep the night before. You don't know that. The police officers escorted him downstairs and put him in the back of a police car. The police officers never told him he was free to leave. He was free to walk about the police station. Case law goes both ways on that. I'm sorry? Case law goes both ways on that. But we have to look at the totality of the circumstances. And it's hard to deny when you stack up all of these circumstances. He's in this room. He's got no blanket. He's got no pillow. Certainly he's not being treated like a witness trying to help the police officers out. A reasonable person in his position. So they didn't give him a bankie? I'm sorry? Go ahead. A reasonable person in this position would not have felt free to leave. And that's the factors that we have to look at. And I would posit that he was in fact arrested looking under those factors under Mendenhall and the factors that Illinois considers, which we've just discussed, the fact that the police officers. But Anderson is the exact same case. Anderson, I'm sorry, is not the exact same case. Because Anderson is premised. It's even weaker than this. I mean, this case is even weaker. But this case is not like Anderson. In Anderson, the defense agreed he came to the police station voluntarily. So you start from a different point. But there's a different perspective. In our case, we only have the defendant never testifies. And I know you can't be held against them. But the only testimony you have is the police officer. So, therefore, yours are all conclusions and assumptions. They're not really facts and evidence. They're not in evidence. Well, I do have some facts and evidence. I'm just going to review them one more time, and then I'm going to reserve my time for rebuttal, if that's okay, Your Honor. So let's see if we have more questions. So here are the facts. And you can keep going, I mean. Okay. I don't want to overstate my position. I understand that I'm going to. We know you're the head of training. We wouldn't want people to think that lawyers are deprived of their time. Thank you, Your Honor. By badgering. Well, these are facts that are out in the record, that you have to jump to a conclusion. These are the facts that I'm relying on. And my conclusion that he was arrested. And these are all facts, again, under Vasquez, under what the state agrees, even under Anderson says that you can take a look at the number of officers, the fact that they had guns displayed, the lateness of the night, the fact that the defendant was not dressed. He was roused, basically, from either his bed or sitting on the couch at a late hour at night. He was put in a police car. He was taken to the police station and processed with fingerprints and mugshots. Put in a 13-by-13 window this room. He was Mirandized. That's a pretty significant indication of an arrest. I'm sorry? They normally Mirandize. Mirandize is only necessary when a person is in custody. So whether it's standard operating police procedure, it's indicative of an arrest. The electronic recording was started, which is only necessary when a person is in custody on arrest for first-degree murder. There's no indication that the defendant was aware of that, though. Is that correct? There's no indication in the record that he was consented to that. But it's part and parcel of what you're saying. Intent of the officers is a consideration, and if they intended to turn on that electronic recording. What you're saying is that it's consistent with him being, in fact, arrested all of this time. Exactly, exactly. The Miranda, the ESI, et cetera. The arrest report written by Detective Artiega says, I arrested him at his house. That was the supplementary report. The arrest report itself says arrested at his house, and then only later was corrected on page five. He's 22. He has no prior convictions. He was not told that he could leave. He was not told he could refuse to go, and he was held for 36 hours. Your Honor, those are all facts. Those are not my conclusions. So when you take a look at the totality of the circumstances based on those facts, using the de novo standard of review, he was under arrest at his home. And if we go along with you on that issue, then, your case is going to turn more crucially on probable cause. Yes. Yes. And, again, looking at the facts of the case, at the time, the police officers only knew, at most, that Jason Russell was present. Without the car, I think you might be in better shape, but I think the car and the VIN number creates a bit of a tricky issue for you. Well, we have to be careful about how we think about the car, because Demetria Dorsey said Squirrel had this car, and that's how they knew to look for this Buick Regal. But we have conflicting information on that, because Detective Artiega said, I talked to the witnesses at the scene, the witnesses who heard the gunfire, and who saw the car involved in the offense drive by. They said it was a four-door. They said it was a boxy-style Chrysler. So the police officers, I would posit, should have been looking for the car seen at the time of the murder. And we don't have a match here. Two doors versus four doors is a pretty significant difference. So I think that the, to borrow your Honor's phrasing, the car is a little bit of a red herring. But they do have his car. They have his car, but they didn't process it. At the time that they took him, they were in the process of impounding it. But that doesn't effectuate. What's your reading on when it was that Dorsey ultimately said, Squirrel equals Russell? The record is very clear on that. It's at the lineup, 24 hours after he was arrested or taken into custody. There's no testimony by anybody, Artiega included, that would indicate that that information had been conveyed prior to the lineup itself? Well, at trial, Detective Artiega said, when I initially talked to Demetria, she gave me a possible name of Jason Russell. But at trial, Demetria Dorsey said, in 2007, I didn't know Squirrel's name. And that's what's interesting. So there's conflicting testimony in the record and even in the hearing. Well, but Artiega also said at the hearing, he said, the first time Jason Russell was identified as Squirrel was at the lineup. And that's on page PD. Can we use the testimony of the detective at trial about the conversation in order for us to determine whether or not there was probable cause? You can, Your Honor. You can take a look at the trial testimony. But it needs to be taken. You think a shadow should be cast on it? Yes, because it conflicts with his own testimony at the motion to suppress and with Demetria Dorsey. So you have to make a credibility, I suppose, determination there. And I don't think that's sufficient. If you lose the probable cause argument and the arrest argument, they were there at his house without a warrant, how would you address that? If he's at his house without a warrant, but there is probable cause to arrest. Given that he invited them into the home. Well, if there is no probable cause to arrest, then I would have to acknowledge then under New York v. Harris, that if they had probable cause to arrest him and he made the statement outside of his home, then I'm in a significantly weaker vantage point at this point. Oh, you're pretty straight. Out of luck, Your Honor. You're pretty good. I'll give you credit. She's in charge of training. If there are no more questions, I'd like to reserve my time. Thank you very much. Thank you. You were fun. Thank you. Ms. Marshall. I'm sorry. On certain cases, it's like I get a button push. It's not a mute button. Ms. Marshall, you may proceed. Good morning, Your Honors. Good morning. May it please the Court. Your Honor, the people request that you affirm the trial court's ruling and affirm defendant's sentence. As was previously discussed, on November 3rd, when officers arrived at the defendant's home, Detective Artiega already has a wealth of information. He has Demetria Dorsey, who's informed him that she is familiar with Squirrel being crucified. If we can, separate the two issues. First, we'll put probable cause off to the side and try to persuade us that this young man was not, in fact, arrested when they go to his house at 1130, six strong weapons displayed, and they take him off to the station. Absolutely. Your Honors, defendant had the burden of showing that there was an illegal arrest. And what is actually provided as evidence at this motion is Detective Artiega's testimony that there was no intent to arrest defendant at his home, that there was no NDCF arrest. There is not enough to just say officers showing up who wear weapons as a normal course of their jobs is enough to say that there was an arrest. There were six officers who show up at the home, but only four of them go up to the second floor apartment for the defendant, and he actually invites them into his home and invites them into his dining room. Defendant is never handcuffed. He is never told that he must go with these officers. There's no physical force that is used to transport defendant, take him out of his home, and bring him to the station. At no point does defendant ask if he can leave or is told that he cannot leave. Justice Smith told us a few minutes ago that the reason nowadays that they go in with big numbers is for a show of force. So isn't the fact that they show up at his doorstep a show of force, which would give a maybe innocent person the cause to leave? I don't think I can stay home if I don't want to go away with those guys. Your Honor, I would say that this is merely a cautionary procedure. This is a homicide investigation. There are multiple officers who show up due to the nature of this investigation. What we don't have here is any evidence, any testimony from the defendant or by way of any other witness at this motion to say that that caused a reasonable belief that he was placed under arrest simply because there were more officers. Well, it caused the officer to write that he was arrested at that time. What happened at the motion is Detective Artiega testified that that was an accident, that the watch commander's notes corrected that. But the accident is consistent with this young man thinking that he had been arrested. If he thought he was arrested, which again, we have no evidence by way of his testimony or other witnesses that that's what he actually believes at the time. The trial court found that Detective Artiega's testimony was credible. He believed Detective Artiega's testimony, that it was merely a mistake to put that in the report and that that mistake was corrected later. The trial court said... Well, essentially, the detective's statement there is basically his opinion about when he was arrested. If he said, well, I gave a formal statement of arrest the next day, we could take the judge's finding on that as true. But what we're talking about is when was he, based on the fact that you have to go by, when was he actually placed on arrest? Based on the facts we have to go by, the defendant was not immediately arrested, even when he was brought into the station. He is not immediately fingerprinted and photographed as soon as he comes into the station. He is at the home on November 5th when officers arrive, goes to the station. It is not until November 7th that the arrest takes place. But during that time, he is not photographed or fingerprinted until November 6th, around 630. So this is not an immediate... It's not like they brought him for a sleepover. They brought him to the police station. There were six police officers. They took him. They took his car. They put him into an interrogation room. They Mirandized him. They started the ESI. If he wanted to go to the bathroom, he had to knock on the door. Not the bathroom door. Not the bathroom door. Yeah. Not the bathroom door. If he wanted to go one way, out the front door, that's one thing. But he couldn't even go to the bathroom unless he knocked on the door. So to me, it seems like a reasonable person in his situation might think, there's no way I can just waltz out of here. Your Honor, these are actions that would be taken with a witness that is in a homicide investigation. Those are standard procedures. These are standard procedures. And Detective Artiega even testifies. We don't go by the police knowledge. We go by what an innocent person would think. Absolutely. Did they say you have to knock on the door because of this procedure? Did they say you have to knock on the door? Well, Your Honor, you are correct in that we have to consider what a reasonable person would believe. But, again, we have no testimony or evidence what the defendant actually believes. What we do have is the detective's testimony regarding his intent for arrest. We don't need the defendant's testimony as to what he was thinking. We can look at the circumstances here and say, would a reasonable person in these circumstances think, you know, I can go down with him, but I can go back home, I can go do whatever I want to do. It sure didn't seem that way. At the point that the defendant is asked to go with the officers and not forced, not handcuffed, not patted down or searched, at the point that the defendant is put in a room but not handcuffed at the station, at the point that he is first placed in the interview room, Detective Ortega testifies that the door was not even closed, at the point that he volunteers and agrees to do a polygraph while he was there, all of this supports his voluntariness of being at the station. He was compliant. There's no doubt about that. How about probable cause if we separate it from the arrest for the moment? Your Honor, there was plenty of information that the detective officers had to establish probable cause. He has Demetria Dorsey testifying that the defendant was outside waiting for them when she drops off her boyfriend. She is familiar with the type of car he drives, and this is in fact the type of car that officers see right outside of his residence when they go to that very same address that Demetria Dorsey provides them with. Two-door or four-door? Demetria Dorsey provides Detective Ortega with a two-door Buick. However, when we hear information from the witnesses who are on the scene, it is vague. It is a dark, boxy vehicle. There was some discrepancy of whether that could have been a Chrysler or a Buick. But probable cause does not need to be evidence that would be sufficient to convict. It needs to be enough for the officers to establish more than a mere suspicion. And when you have several people given a vehicle description that is somewhat similar and then you see that vehicle outside the door, that does support probable cause when you look at the totality of the circumstance and all the information that Detective Ortega has. He also spoke to Dexter Dale, who informs him that he hears from a friend the defendant places himself at the scene of the murder, that he says that he's riding around and that another person shoots Christopher while they're in the car together. All of this information supports probable cause at the point that the detective knows this when he finally arrives at the defendant's home. Well, aren't you trying to have it both ways? You make a strong case. I got probable cause to arrest this guy, but you say, well, we just found that to invite him down for a statement. Your Honor, I believe that it does support both ways because probable cause does not dissipate just because an officer decides to make an arrest later. There is the possibility of having probable cause and still having a defendant volunteer to go to the state. It does seem that the state is doing something that my mother used to accuse me of. She used to tell me that was a good thing I had a round mouth because I was talking out of both sides of it. I mean, you know, plenty of probable cause, but we didn't arrest him? Your Honor, the law allows for this. It allows for detectives to investigate, hear from witnesses, have plenty of information, and it does not require them to have to make an arrest at the point that they have enough information to establish probable cause. But when I come in at 1130 at night with six officers, four upstairs, to take him, to quote, invite him down, and you know you have a pretty good idea that you think he's the perpetrator, doesn't that kind of tend to point toward an arrest? It supports detective arguments. In other words, the thing I'm looking at, are you going to let the guy stay in his apartment? You're not telling me you've got all this evidence on him. He could drive his own car. He could drive his own car. And you're going to let him stay in his apartment. Detective Arteaga testifies that he is treating the defendant as a friend of the decedent. This is part of a continued investigation. He murdered him or had some hand in it. But this is part of a continued investigation. He doesn't need to get to the point of deciding whether or not defendant needs to be arrested at this point because he voluntarily goes to that station. There's never even a necessity for that judgment call if you have the individual who you want to speak to, who you want to continue to investigate by way of interview, volunteering to go with you to the station. And that completely negates an illegal arrest if that person is going to volunteer to go with you, which is what defendant did on this evening. 1130 at night is not in DCL alone of an illegal arrest. The testimony is that defendant is the one who answers the door after they knock, that no one has to awake him from his sleep or pull him out of the bedroom. This is a defendant who apparently was awake who said on his own that he wanted to change clothes and got dressed and decided to go with the officers. And we have no information, no testimony or evidence to rebut the credible testimony of Detective Arteaga  Your Honor, for these reasons and others that are stated in the People's Brief, we ask that you affirm the trial court's ruling and affirm defendant's sentence. Thank you. Just very briefly, Your Honors, whether or not Jason Russell voluntarily came down to the station is the question that we're here to decide today. So I just wanted to point that out. And the fact that he was not handcuffed or patted down is not dispositive in and of itself. And I would point out that there was no real need to pat him down because he was undressed at the time that they saw him. He had asked to put clothes on, so that negated the need for that whatsoever. The fact of the matter is Detective Arteaga believed he was only a potential witness. If he believed that there was probable cause to arrest him, he should have gotten an arrest warrant when entering his house to take him into custody. For those reasons, we ask this Court to reverse the conviction, remand for a new trial. Thank you. Thank you. The case was well briefed and well argued. I think we all enjoyed it. The decision will be issued in due course. Thank you.